**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT GLEN MYERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.:** |
| | ) | |
| | ) | |
| **URBAN CHESTNUT BREWING** | ) | |
| **COMPANY, INC.** | ) | **INJUNCTIVE RELIEF SOUGHT** |
| **For Profit Corporation** | ) | |
| **d/b/a URBAN CHESTNUT BREWING** | ) | |
| **COMPANY** | ) | |
| | ) | |
| | ) | |
| **Defendant(s).** | | |

## COMPLAINT

Plaintiff, ROBERT GLEN MYERS (hereinafter "MYERS"), by and through the undersigned counsel, hereby files this Complaint and sues URBAN CHESTNUT BREWING COMPANY, INC., For Profit Corporation, d/b/a URBAN CHESTNUT BREWING COMPANY ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1.      This action arises from Defendant's failure to make Defendant's online platform located at www.urbanchestnut.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MYERS, full and equal access to Defendant's products and services.

1

2.      MYERS files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's products and services.

3.      Accordingly, MYERS seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4.      This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA.  *See also,* 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5.      Venue is proper in this Court, Eastern Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court For the Eastern District of Missouri in that a substantial part of the acts and omissions giving rise to MYERS's claims occurred in St. Louis City County, Missouri.

6.      Defendant attempts to, and indeed does, participate in the this St. Louis City County's economic life by offering and providing products and services over the internet to St. Louis City County's residents, but also extends it services to other residents within the state of Missouri through its online presence, including MYERS, who is a resident of Caldwell County. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Missouri residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Missouri every time a Missouri resident visits Defendant's Website.

7.      Further, Defendant operates a principal place of business with a physical address of 4465 Manchester Ave, Saint Louis, Missouri 63110 (hereinafter "Defendant's Principal Place of Business"), which is located in St. Louis City County, Missouri.

8.      MYERS was injured when he attempted to access the Digital Platform but encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9.      MYERS is a natural person over the age of 18 and is blind.

10.     MYERS is *sui juris* and is a resident of the State of Missouri residing in Hamilton, Missouri, located in Caldwell County.

11.     MYERS is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MYERS is legally blind from age-related macular degeneration[1], and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MYERS uses screen access software to access digital content, like text messages, emails, and websites.

12.     MYERS    cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software

---

[1] The term "blind" or "blind person" as used throughout this complaint refers to persons with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200. Some blind people who meet this definition have limited vision, whereas others have no vision.

3

reads the content of a webpage to the user. As explained in the Eastern District of New York

holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to
> effectively use websites. For example, when using the visual internet, a seeing user
> learns that a link may be 'clicked,' which will bring him to another webpage,
> through visual cues, such as a change in the color of the text (often text is turned
> from black to blue). When the sighted user's cursor hovers over the link, it changes
> from an arrow symbol to a hand. The screen reading software uses auditory -- rather
> than visual -- cues to relay this same information. When a sight impaired individual
> reaches a link that may be 'clicked on,' the software reads the link to the user, and
> after reading the text of the link says the word 'clickable.'...Through a series of
> auditory cues read aloud by the screen reader, the visually impaired user can
> navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13.    MYERS' blindness limits him in the performance of major life activities, including

sight, and he requires assistive technologies, auxiliary aids, and services for effective

communication, including communication in connection with his use of a computer.

14.    MYERS frequently accesses the internet. Due to blindness, to effectively

communicate and comprehend information available on the internet and thereby access and

comprehend websites, MYERS uses commercially available screen reader software to interface

with the various websites.

15.    Defendant is For Profit Corporation with a principal place of business of 4465

Manchester Ave Saint Louis MO  (hereinafter "Defendant's Principal Place of Business").

16.    Defendant operates Urban Chestnut Brewing Company (UCBC) which is a brewery

with multiple locations, including The Grove Bierhall in St. Louis, Midtown Biergarten in St.

Louis, and Hallertauer Brauerei in southern Germany. They offer a variety of beers ranging from

traditional lagers and IPAs to non-alcoholic brews. Their locations also provide a diverse food

menu ranging from German fare to pizzas and sandwiches. Defendant via Defendant's Website

regularly updates their community with news on seasonal beer releases, new product launches, and events. In order to access, research, learn about Defendant's products or purchase tickets or reserve spots for Defendant's events or tours, consumers may visit Defendant's Website.

17.    Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices and procedures concerning Defendant's Website development and maintenance.

18.    Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and it's implementing regulation as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's premises are also referenced as "place of public accommodation".

19.    Defendant's Website, www.urbanchestnut.com, functions as an integral extension of Defendant's principal business location at The Grove Bierhall, 4465 Manchester Avenue, St. Louis, MO 63110. The website provides comprehensive access to key services offered by Defendant, including detailed information on their diverse selection of beers and food menus available at their physical locations. It enhances product accessibility by showcasing seasonal releases and special announcements, thereby serving as a dynamic platform for engaging with customers. Additionally, the website clearly articulates business hours and provides avenues for purchasing event tickets, making it a crucial link between Defendant's physical and digital presence. By offering these services online, Defendant's Website ensures that customers have continuous access to up-to-date information, thus reinforcing the connection between the virtual site and the business's operational headquarters.

20.    At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling the Website. Since the Website is open to the public through the

internet, by this nexus the Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in Principal Place of Business. As such, Defendant has subjected itself and the Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21.     MYERS is and has been a customer who is interested in patronizing, and intends to patronize in the near future once Defendant's Website's access barriers are removed or remedied, Defendant's Premises.

22.     Defendant, Urban Chestnut Brewing Company, Inc., operates multiple brewery locations as outlined on Defendant's Website, which serves as an informational and promotional platform for its products and services. The principal address for Defendant's operations, as noted on Defendant's Website, is located at The Grove Bierhall, 4465 Manchester Avenue, St. Louis, MO 63110. This address signifies the central hub of Defendant's business activities, which are further detailed and promoted through various sections of Defendant's Website, including information on beer offerings, food menus, and event ticket sales, thereby establishing a direct connection between Defendant's physical presence and its online representation.

23.     Defendants' Website is additionally used to search for brick and mortar store locations, check store hours and food and beverage options and pricing, purchase tickets and reserve spots for events, and sign up for an electronic emailer to receive offers, benefits, exclusive invitations, and discounts for use at the Website or in the physical store locations.

24.     The opportunity to browse and research the available menu items and beverages al available for purchase in the Premises, as well as learn about the events offered at the Principal Place of Business and sign up for an electronic emailer to receive offers, benefits, exclusive invitations, and discounts for use in the Premises from his home are important accommodations for MYERS because traveling outside of his home as a visually disabled individual is often difficult, hazardous, frightening, frustrating and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25.     Like many consumers, MYERS accesses numerous websites at a time to compare merchandise, prices, sales, discounts, events, and promotions. MYERS may view several dozen websites to compare features, discounts, promotions, and prices.

26.     On or about January 5, 2025, MYERS initially attempted to utilize Defendant's Website to browse the merchandise and online offers to educate himself as to the available food and beverage options, events, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Premises.

27.     MYERS utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

28.     While notice to Defendant is not required, MYERS sent a pre-suit communication on February 18, 2025. As such Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's website.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

29.     MYERS adopts and re-alleges the allegations stated in paragraphs 1 through 28 above as if fully stated herein.

30.     On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements.  The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

31.     Congress found, among other things, that:

a.     some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b.     historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c.     discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d.     individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

     e.     the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 .S.C. § 12101(a)(1)-(3),(5) and (9).

    32.    Congress explicitly stated that the purpose of the ADA was to:

     a.     provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

     b.     provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

     c.     invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

    33.    Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

    34.    "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited

access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and

severe underenforcement of the statute—soon destroyed this hope."[2]

35.     More than thirty years "after the passage of the ADA, numerous facilities are still

not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the

ADA allows both the U.S. Attorney General[3] and private individuals[4] to sue, but the rate at which

[ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department

of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[5]

36.     Thus, "private suits by necessity represent the main tool for ensuring compliance

with Congress' intent in passing the ADA,"[6] most of which suits "are brought by a small number

of private plaintiffs who view themselves as champions of the disabled." [7]

37.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that

because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an

important role in enforcing the ADA[.]"[8]

---

[2] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[3] 42 U.S.C. § 12188(b).

[4] 42 U.S.C. § 12188(a).

[5] Johnson, *supra* note 8.

[6] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[7] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[8] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

38. Consistent with these policies, MYERS files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from its physical facilities.

39. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

40. There is a physical nexus between Defendant's Website and Defendant's Premises in that the Website provides the contact information, operating hours, and access to products found at Defendant's Premises and address of Defendant's Premises. The website acts as the digital extension of the Principal Place of Business providing The opportunity to explore and pre-order Defendant's beer selections and menu offerings available at Defendant's physical locations, as well as to sign up for electronic newsletters to receive offers, benefits, exclusive invitations, and discounts for use at the premises from home, are significant accommodations for individuals like MYERS. This is particularly important because traveling outside of his home as a visually disabled individual can often be a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant's Website has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software..

41. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

42. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Website at issue in the instant action.

43.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

44.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

45.     Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

46.     According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2)

specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

47.     Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MYERS, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or have been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

48.     MYERS attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MYERS' screen reader software. Specifically, features of Defendant's Website are inaccessible to MYER'S screen reader software, including, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

a. Modal dialog inaccessible for screen reader users

13

• Issue: The modal dialog lacks role and aria attributes, and keyboard focus can shift to background content.

• WCAG 2.1 AA Violations: 4.1.2 - A - DIALOG

• Impact: Users with visual disabilities may struggle to interact with modal dialogs due to focus issues, causing frustration during navigation.

b. Missing textual description for informative image

• Issue: Informative images lack textual descriptions, preventing screen reader users from understanding their purpose.

• WCAG 2.1 AA Violations: 1.1.1 - A - INFORMATIVE

• Impact: Without descriptive text, users with visual disabilities cannot grasp the significance of images, hindering their comprehension of content.

c. Missing skip to content link

• Issue: The website lacks a "Skip to content" link, forcing users to navigate through repetitive content.

• WCAG 2.1 AA Violations: 2.4.1 - A - BYPASS BLOCKS

• Impact: Users with visual disabilities face challenges accessing main content quickly, leading to inefficient navigation.

d. Missing heading mark-up - H1

• Issue: The absence of an H1 heading makes it difficult for screen reader users to understand the page structure.

• WCAG 2.1 AA Violations: 1.3.1 - A - BYPASS BLOCKS

• Impact: Users with visual disabilities find it challenging to comprehend content organization, affecting their overall experience.

e. Unnecessary alt text for decorative image

• Issue: Decorative images have descriptive alt text, which is unnecessary and unhelpful for users with visual impairments.

• WCAG 2.1 AA Violations: 1.1.1 - A - ALT

• Impact: Users with visual disabilities encounter irrelevant information, complicating their navigation and understanding of page content.

f. Headings not announced for visually impaired users

• Issue: Text elements are not marked as headings, leaving users unaware of section purposes.

• WCAG 2.1 AA Violations: 1.3.1 - A - #HEADING RANKS

• Impact: Users with visual disabilities struggle to discern section relevance, impacting their navigation efficiency.

g. List mark-up used incorrectly

• Issue: Interactive images are incorrectly marked as list items, confusing screen reader users.

• WCAG 2.1 AA Violations: 1.3.1 - A - #ARTICLES

• Impact: Users with visual disabilities face difficulties interpreting content, hindering their understanding and navigation.

h. Use of multiple heading 1's <h1>

• Issue: Multiple H1 headings are used, confusing screen reader users about page structure.

• WCAG 2.1 AA Violations: 1.3.1 - A - HEADINGS

• Impact: Users with visual disabilities may find it challenging to understand page hierarchy, affecting their navigation.

i. Non-descriptive and identical links announced for screen reader users

• Issue: Links like "Reserve Tickets" lack descriptive text, making it hard for users to understand their purpose.

• WCAG 2.1 AA Violations: 2.4.4 - A - LINK PURPOSE-IN-CONTEXT

• Impact: Users with visual disabilities struggle to identify link destinations, leading to confusion and inefficient navigation.

j. Role defined inappropriately

• Issue: Incorrect role definition on "Reserve Tickets" links confuses screen reader users.

• WCAG 2.1 AA Violations: 4.1.2 - A - LINK

• Impact: Users with visual disabilities face challenges understanding element purposes, affecting their interaction with the page.

k. Non-descriptive link text

• Issue: Link text "Reserve Tickets" does not indicate they open in a new window, confusing screen reader users.

• WCAG 2.1 AA Violations: 2.4.4 - A - LINK PURPOSE-IN-CONTEXT

• Impact: Users with visual disabilities may be unaware of new windows opening, disrupting their browsing experience.

l. Missing keyboard support

• Issue: Keyboard support is absent for form fields like "date picker," affecting users with mobility impairments.

• WCAG 2.1 AA Violations: 2.1.1 - A - KEYBOARD, 4.1.2 - A - COMBOBOX SELECT-ONLY

• Impact: Users with visual disabilities reliant on keyboards face difficulties accessing form functionality, limiting their interaction.

m. Non-interactive elements receive keyboard focus

• Issue: Non-interactive elements receive focus due to incorrect 'tabindex' usage, adding unnecessary tab stops.

• WCAG 2.1 AA Violations: 2.4.3 - A - FOCUS ORDER

• Impact: Users with visual disabilities encounter confusion and inefficiency navigating through extra focus stops.

n. Incorrect alternate text for image link

• Issue: Logo image link has inaccurate alt text, failing to convey visual information accurately.

• WCAG 2.1 AA Violations: 1.1.1 - A - FUNCTIONAL

• Impact: Users with visual disabilities cannot access the intended information conveyed by the image, affecting their understanding.

o. Breadcrumb links not accessible by screen reader.

• Issue: Breadcrumb links do not convey visual information to assistive technologies, posing navigation challenges.

• WCAG 2.1 AA Violations: 1.3.1 - A - BREADCRUMB, 4.1.2 - A - Unknown Violation Title

• Impact: Users with visual disabilities struggle with navigation due to lack of role information, hindering their browsing experience.

p. Heading mark-up used unnecessarily

• Issue: Text like "$12.00" is incorrectly marked as a heading, confusing screen reader users.

• WCAG 2.1 AA Violations: 1.3.1 - A - HEADINGS

• Impact: Users with visual disabilities may misunderstand content structure, leading to navigation difficulties.

q. Empty heading found in page source code

• Issue: An empty heading is present, confusing screen reader users about content structure.

• WCAG 2.1 AA Violations: 1.3.1 - A - HEADINGS

• Impact: Users with visual disabilities may think they are missing content, affecting their understanding of the page.

r. The "Add to Cart" message not announced for screen reader users

• Issue: Screen reader focus does not shift to updated content after adding to cart, leaving users unaware of changes.

• WCAG 2.1 AA Violations: 4.1.3 - AA - STATUS MESSAGES

• Impact: Users with visual disabilities miss crucial status updates, impacting their shopping experience on the website.

49.    Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on January 14, 2025, and who confirmed the access barriers that MYERS had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MYERS.

50.    More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

51.    There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

52.    Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

53.    To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 48 and 49 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MYERS, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

54.    Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

55.    Here, however, MYERS, through counsel, did send a pre-suit communication informing of the barriers to access on February 18, 2025. As such Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's website.

56.    As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Premises.

57.    Because of the inadequate development and administration of the Defendant's Website, MYERS is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

58.    Enforcement of MYERS' rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

59.    MYERS has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MYERS is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

60.    Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MYERS appropriate and necessary injunctive relief; including an order to:

a.    Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of the Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through the Website.

b.    Require Defendant to take the necessary steps to make the Website readily accessible to and usable by visually disabled users, and during that time period prior to the Website's being readily accessible, to provide an alternative method for

20

individuals with visual disabilities to access the information available on the
Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals
with visual impairments will be able to effectively communicate with the Website
for purposes of viewing and locating Defendant's Premises, and becoming
informed of and purchasing Defendant's merchandise online, and during that time
period prior to the Website's being designed to permit individuals with visual
disabilities to effectively communicate, to provide an alternative method for
individuals with visual disabilities to effectively communicate for such goods and
services made available to the general public through the Website.

WHEREFORE, MYERS requests entry of judgment in his favor and against Defendant for
the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website,
and continue to monitor and update Defendant's Website on an ongoing basis, to
remove barriers in order that individuals with visual disabilities can access, and
continue to access, Defendant's Website and effectively communicate with
Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal
disabled logo within Defendant's Website, wherein the logo would lead to a page
which would state Defendant's accessibility information, facts, policies, and
accommodations. Such a clear display of the disabled logo is to ensure that

individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D.      An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E.      An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F.      An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G.      An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H.      An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, the Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.      An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance

with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J.      An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of the Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K.      An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L.      Such other and further relief as the Court deems just and equitable.

Dated: April 14, 2025                         Respectively submitted,


                                              **ADA LEGAL TEAM, LLC**

                                              /s/ Gregory S. Sconzo
                                              Gregory S. Sconzo          #0105553(FL)
                                              Kevin W. Puckett           #70706(MO)
                                              4700 Belleview Avenue, Suite 100C
                                              Kansas City, Missouri 64112
                                              Phone: (816) 890-9599
                                              Facsimile: (816) 203-8590
                                              greg@ADALegalTeam.com
                                              kevin@ADALegalTeam.com


                                              **ATTORNEY FOR PLAINTIFF**